## Brandenberg v. J. Boos Dairies.

*Workmen's compensation — Death as result of injuries — Medical testimony—Opinions—Evidence.*

1. Disability, overtaking an employee at his work, is not compensable unless the result of accident; and the burden is on complainant to prove it was such and not from natural causes.

2. Death and disability, overtaking an employee in the course of his employment and resulting from a natural cause, cannot be treated as accident.

3. Compensation for the death of an employee will not be allowed where it appears that deceased fell on the street while walking behind a wagon and sustained external injuries to the head, that he had been suffering from chronic heart disease, that the doctors could not say death resulted from the injuries to the head causing dilation of the heart, and that the weight of the medical testimony was that dilation of the heart caused loss of equilibrium and the fall, resulting in the external injuries after death.

Appeal from award of Workmen's Compensation Board. C. P. No. 5, Phila. Co., Dec. T., 1926, No. 8149.

*J. Morris Yeakle,* for plaintiff; *G. H. Detweiler,* for defendant.

MARTIN, P. J., Sept. 7, 1927.—Frank Brandenberg was employed by the defendant, J. Boos Dairies, to drive a horse and wagon in serving a milk route. On Sunday morning, April 15, 1923, he left his place of employment, at 4.30 o'clock, to start his route. He was next seen about an hour later on 25th Street near Brown, walking behind the wagon, delivering milk to customers. He turned from 25th Street into Brown Street. Five minutes later, a fellow-employee followed him from 25th Street into Brown Street and found his dead body lying in the street, with two wounds on the head. The horse and wagon were standing about fifty yards in advance of the spot where the body lay.

A coroner's jury rendered a verdict that the cause of death was acute dilation of the heart.

A claim for compensation was presented by the widow.

The referee before whom the claim was heard found that the injuries decedent sustained about his head could not be disassociated from the dilation, and that there was actual causal connection between the injuries which decedent sustained in his fall and his death, which was hastened thereby, and concluded, as a matter of law on the facts above recited, as the decedent met with such an accident as is contemplated by article III of the Workmen's Compensation Act of June 2, 1915, P. L. 736, and its amendments, his dependent, the widow, is entitled to compensation.

The defendant and the insurance carrier appealed to the board. A hearing *de novo* was granted, and additional testimony was ordered to be taken by the referee.

The board found as a fact: Decedent, while delivering milk in the course of his employment, fell to the street, sustaining a laceration over the right eye and another one in the *occipito parietal* region, both of which were deep, but did not cause a fracture of the skull or concussion of the brain; that the fall and the injuries occasioned by it aggravated a pre-existing heart condition and hastened decedent's death, the ultimate cause of death being acute dilation of the heart. The conclusion of law was: "That the decedent's death having been hastened by an injury, by accident, while he was in the course of his employment, his dependent widow is entitled to compensation."

The defendant entered this appeal and filed exceptions to the decision of the Workmen's Compensation Board:

"1. The Compensation Board erred in finding as a conclusion of law 'that the decedent's death having been hastened by an injury, by accident, while he was in the course of his employment, his dependent widow is entitled to compensation.'

"2. The Compensation Board erred in making an award against the defendant in this case.

"3. The Compensation Board erred in that portion of its fourth finding of fact which says, 'About 5 A. M. he was found lying in the street, bleeding from lacerations of the head, and died within a very short time,' as there was no testimony to support such a finding.

"4. The board erred in its fifth finding of fact, as follows: 'That the decedent, while delivering milk in the course of his employment, fell to the street, sustaining a laceration over the right eye and another one in the *occipito parietal* region, both of which were deep, but did not cause a fracture of the skull or concussion of the brain. That this fall and the injuries occasioned by it hastened and aggravated the pre-existing heart condition and hastened the decedent's death, the ultimate cause of death being acute dilation of the heart;' there being no evidence to sustain a finding 'that this fall and the injuries occasioned by it hastened and aggravated the pre-existing heart condition and hastened the decedent's death.'

"5. The pleadings did not allege, and the proofs did not establish, aggravation of any pre-existing condition as resulting from injuries in this case."

No one saw Brandenberg fall. There was no evidence of any physical condition in the street where he was found lying to cause him to fall. The foreman in the employ of defendant, who drove the wagon back from the place where it was standing on the street after the death of Brandenberg, was asked by the referee during the hearing: "What became of the milk wagon after the accident?" He answered: "They phoned in about the accident, and Mr. Boos and I went in a Yellow cab, and I took the wagon and finished the route. . . . Q. How soon after this accident happened were you on the scene of the accident? A. I judge about a half-hour. . . . Q. When you got to the scene, was there anything wrong with the wagon; were any steps broken or anything different from when he started out? A. No. . . . Q. When you took over this wagon, you observed nothing unusual with the milk bottles or anything indicating that anything unusual had happened on that morning? A. No."

Dr. Burke was the coroner's physician and made a *post-mortem* examination of Brandenberg. It was proved that decedent had suffered from chronic heart disease for some time prior to his death. He testified for claimant that there was a laceration over the right eye and of the left *occipito parietal* region. He was asked: ". . . Have you heard the testimony here to-day? A. Yes. Q. I will ask you, basing your opinion upon that testimony, together with your findings, as to the cause of death in this case? A. Acute dilation of the heart. Q. In your opinion, from the testimony, do you find any connection between the acute dilation and the accident? A. I think the shock or fall would produce it. Q. Is that your opinion, it would produce that condition? A. Yes. . . ." He testified that he did not find any fracture of the skull, or concussion of the brain, no evidence of paralysis, no apoplexy, no clotted blood or anything in the brain, and that the lacerations were not sufficient to cause a fracture or paralysis. . . . "Q. You think it is reasonable to presume that the diagnosis here, as shown by your examination, acute dilation of the heart, was caused by these lacerations? A. Yes. Q. Taking into consideration the testimony that you heard of the fact that on the morning this man went out,

Brandenberg *v.* J. Boos Dairies.

he complained that his stomach was not good and that he had been out late, you still consider, in the light of that testimony, since counselor for the claimant laid stress on the testimony, that it is reasonable to presume that the acute dilation of the heart was caused by something that resulted in these superficial lacerations? A. Yes. Q. Isn't it a thousand times more probable to suppose that the lacerations were merely an incident to the fall resulting from the acute dilation than to say the acute dilation was caused by the lacerations? As an expert, what is the probability; isn't it more reasonable to suppose that this man got an acute dilation of the heart and then fell, and the lacerations were caused incidentally to the fall? A. That could be. Q. And the probability would be greater that the lacerations were caused by the acute dilation than the accident the cause of acute dilation? A. There would be a probability. Q. But the probability would be greater that the lacerations were caused by the acute dilation than the accident the cause of acute dilation? A. Yes." He was asked by the referee: ". . . What was the purpose of your *post-mortem?* A. To find the cause of death. Q. You found dilation of the heart, which is practically the real cause of all deaths? A. Yes. Q. As to the causes of that dilation, you didn't make an examination? A. We didn't look for it. Q. Was the examination such that you could definitely have fixed anything with relation to the cause of the dilation? A. No."

Dr. Blakeslee, the medical examiner for the board, was asked by counsel for the claimant: "Have you heard the testimony in this case this morning? A. I heard the medical testimony. Q. I am going to ask you, basing your opinion on that medical testimony, as well as the other testimony you heard, whether, in your opinion, you find any connection between the accident described and this man's death? A. I am unable to disassociate the two events." He was asked, on cross-examination: "What do you mean by that? A. I am unable to separate the two. Q. You mean you are not able to say that the death, which was the latter event, was caused by these lacerations? A. No, sir. Q. You are not able to say that? A. No. Q. Are you prepared to say that it did? A. No. I do say that the man was affected with acute dilation of the heart, having had a pre-existing myocardial condition that led to a dilation, and as the result of the dilation, death occurred, and that, in the course of that event, this unforeseen event overtook him which resulted in lacerations to the scalp and cessation of functions immediately thereafter as the result of that fall. Q. These lacerations might have overtaken him subsequent to the dilation? A. They may have, but in my opinion they did not; they occurred as the result of the dilation; the lacerations followed as a result of the dilation. The dilation brought on a stoppage of the functions and caused a disturbance of the body equilibrium, and as the result of that he received the lacerations, external injuries and internal injuries manifested by a sudden cessation of the vital functions which resulted in his death. Q. The loss of the equilibrium was due to the dilation of the heart? A. Yes. Q. After the equilibrium was lost and the deceased fell, the lacerations were caused by his body coming in contact with some object? A. Yes. . . . Q. As a result of the dilation, might not death result? A. Yes, without any violence of any kind, but here, with a history of contact with an external object, the same as a man subject to epilepsy, he has a fit and falls and strikes his head and he dies. Q. But nothing to show that death was due to the lacerations? A. Lacerations would not produce it. . . . Q. Could, as a state of facts, a laceration of the scalp with there being no evidence of any concussion of the brain, any fracture of the bone of the cranium or any evidence of apoplexy, would you say that from such external manifestation it were reasonable to presume

that the acute dilation and death resulted from such apparent contact? A. Yes, decidedly so. Q. Did you ever hear of a case where acute dilation of the heart was caused by a scalp injury? A. No; that is one of the indirect effects, but not caused by it. . . . My opinion is this: the acute dilation was spontaneous and idiopathic in origin due to diseased heart muscle, and as a result thereof violence occurred, manifested externally by lacerations of the head, manifested internally by sudden stoppage of vital functions in such a short period of time that there was no opportunity given for any human being to observe whether there was paralysis or not, or whether there were any other symptoms except a blocking out of vital functions. Q. And that violence may have been subsequent to the acute dilation and death? A. Yes, it must have been." He was asked by counsel for claimant: "Q. Is it not your opinion that most probably the lacerations and abrasions as indicated on the head were what hastened this man's death, regardless of the original fall brought on by the dilation? A. Yes."

The certificate of death was in evidence, in which the cause of death is given as acute dilation of the heart, and the coroner's jury in their verdict found that "Frank Brandenberg came to his death from acute dilation of the heart."

Dr. Blakeslee was subsequently recalled by counsel for the claimant for further examination and asked: "Doctor, you testified at the previous hearing in the case of Brandenberg v. J. Boos Dairies? A. Yes. Q. Have you since that time examined the transcript of testimony? A. Yes. Q. I will ask you now, in view of the order of the board to take any additional testimony, whether you do or desire to add anything to your former testimony? A. I desire to probably elaborate on the term disassociation that I used. I said that I could not disassociate the man's death from his accident. By that I mean we have a man who showed evidence of a heart condition that existed some time prior to the accident and that he suffered a fall as evidenced by marks of violence on his head and death. That here we have a close chain of events from cause to effect and that those factors are included in the consideration and in the conclusion of the disassociation. Q. Doctor, after reading this former transcript of testimony, is it or not your opinion that this trauma evidenced by the marks of injury on the head was the exciting or aggravating or hastening cause of this man's death? A. Yes, sir; that is my opinion. Q. Is that your unqualified opinion? A. Yes." On cross-examination, he testified: "Q. Why, doctor? A. One follows from the other as cause and effect. Q. What makes you say that the trauma preceded death, do you so say? Do you say in this case trauma preceded death? A. I think it did. Q. Do you know? A. Not any more so than you know whether death preceded trauma. There is no way to separate the factors at all. They are woven so closely you cannot isolate them. Q. Why do you think trauma did precede death? A. I don't see how you can tell. Q. You cannot tell? A. I cannot. Q. You don't know? A. You have the factors of death—traumatism and death—and these are all in this case which should be considered in coming to a conclusion. There isn't any doctor on earth that has been able to examine a person on their way to a fall. You cannot tell whether a man is dead when falling? Q. So, in your opinion, here it is based on a guess? A. No, sir. Q. What is it based on? A. The experience of handling this group of cases. . . . Q. . . . in your previous testimony . . . in answer to the question 'and that violence may have been subsequent to the acute dilation and death' and you answered 'yes, it must have been?' A. It may have been. . . . Q. But the lacerations to the head could not have preceded the fall? A. No, and you cannot say

whether or not death preceded the fall. Q. You can only guess as to whether it did or not, can you not? A. Only presume from experience with other cases. Q. This is your best guess, isn't it? A. Well, if you so term it. Q. Is your answer yes or not? I will not answer yes or no. I put it in the category of a conclusion based on a consideration of all the facts. Q. At the original hearing in this case you said, my opinion is this, 'the acute dilatation was spontaneous and idopathic in origin due to diseased heart muscle and as a result thereof violence occurred, manifested externally by lacerations of the head, manifested internally by sudden stoppage of vital functions in such a short period of time that there was no opportunity given for any human being to observe whether there was a paralysis or not, or whether there were any other symptoms except a blocking out of vital functions.' That was your opinion then? A. Yes. Q. Is that still your opinion? A. Yes. Q. Your opinion then was in answer to the question 'and that violence may have been subsequent to the acute dilatation and death,' and you then said 'yes, it must have been,' and now you change that to 'it may have been?' A. Yes. Q. That is your best opinion? A. Yes, sir."

Two medical expert witnesses were called for the defendant, Dr. Attix and Dr. Kennedy. The former testified that dilatation of the heart is a condition quite common, and that it appeared to him "that it would be a thousand times more likely for dilatation to occur and that the man fell unconscious from the dilatation than it would be a fall or injury resulting in the laceration over the eye and occipito parietal region would be the cause of the dilatation. . . . I would certainly deem it a thousand times more likely of injury such as laceration and contusion of the head and face to have followed the dilatation than to have been the cause of it."

Dr. Kennedy, when furnished with a history of the case, was asked: ". . . With that history, in your opinion, was trauma a contributing cause to the dilatation of the heart? A. No, not whatever."

The only evidence produced on behalf of the claimant which approaches the standard required of the expert witness is that Dr. Blakeslee, when recalled, in response to a leading question by the referee, refuted his former testimony.

However convincing the testimony presented on behalf of defendant, this court is confined to the consideration whether or not there was any competent testimony to support the claim. We are not called upon to weigh the testimony or to measure the professional skill and knowledge of the different expert witnesses.

Of the two witnesses called for claimant, Dr. Burke, when recalled, testified that, taking into consideration all the attending data, it was his professional opinion the death of Brandenberg most probably came from the fall and wounds on the head.

There was nothing to cause Brandenberg to fall but the loss of equilibrium occasioned by acute dilatation of the heart. There is evidence that the dilatation caused the fall, but the evidence that death was caused by the fall is not sustained by the quality of testimony demanded.

"If one having special knowledge on the subject cannot, in conscience, say that, in his 'professional opinion, the result in question did come from the cause alleged,' there is in fact nothing in the evidence from which a jury, having no such knowledge, could possibly find that it did: McCrosson v. Phila. Rapid Transit Co., 283 Pa. 492, 496.

"Disability, overtaking an employee at his work, is not compensable unless the result of accident. And the burden is on claimant to prove it was such and not from natural causes: Skinner's Pennsylvania Workmen's Compensa-

Brandenberg v. J. Boos Dairies.

tion Law, 54, and cases there cited. . . . Disability hastened by such exercise cannot be treated as accidental; neither can death or disability overtaking an employee in the course of his employment and resulting from a natural cause; if it could, it would render the employer an insurer of the life and health of the employee: Gausman v. Pearson Co., 284 Pa. 348, 354; Kuca v. Lehigh Valley Coal Co., 268 Pa. 163."

The evidence in this case is not of the quality to support the findings of the Workmen's Compensation Board.

And now, to wit, Sept. 7, 1927, the exceptions filed by appellant to the findings of fact and conclusions of law of the Workmen's Compensation Board are sustained, the action of the board is reversed, and the record is remitted to the board for further hearing and determination.